IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**NICOLE SMALL,**                                        Case No. 1:17 CV 1184

      Plaintiff,                                        Judge Donald C. Nugent

      v.                                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                        REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Nicole Small ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 6, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in January 2014 and December 2014, respectively, alleging a disability onset date of November 1, 2006. (Tr. 172-84). Her claims were denied initially and upon reconsideration. (Tr. 130-33, 135-39). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 143). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 17, 2015. (Tr. 42-79). On May 16, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 23-36). The Appeals Council

denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-8); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on June 6, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background

Plaintiff was born in March 1974, making her 32 years old at her alleged onset date. *See* Tr. 83. She had an eleventh grade education, and a GED. (Tr. 34).

Relevant Medical Evidence

*Treatment Evidence*

The record contains a few mental health treatment notes from December 2006 through December 2007. (Tr. 278-82). In January 2007, Plaintiff was noted to have a depressed mood and reported concentration problems, hallucinations, and paranoia. (Tr. 282). The physician assessed psychosis, not otherwise specified, and noted to rule out schizoaffective disorder. *Id.* Plaintiff was prescribed Lexapro and Risperdal. *Id.* The remainder of these treatment notes reflect Plaintiff was hearing voices, experiencing paranoia, depression, and crying spells. (Tr. 278-82). She also had intellectual limitations. (Tr. 279). Providers prescribed and adjusted medications throughout this period. (Tr. 278-82).

In October 2014, Plaintiff went to Murtis Taylor Human Services for treatment. (Tr. 364). Plaintiff previously received services there and was diagnosed with manic depression and bipolar disorder. *Id.* Plaintiff stated she was off her medications for some time and struggled with outbursts, depression, and crying spells. *Id.* Plaintiff reported attending a community college culinary program and anticipated graduating in 2015. (Tr. 366). The evaluator observed Plaintiff had racing thoughts and reported auditory hallucinations. (Tr. 370). Her behavior started as angry,

agitated, and aggressive, but became more cooperative as the session progressed. *Id.* Plaintiff reported medications worked well for her in the past. (Tr. 371). The evaluator assessed schizoaffective disorder and recommended pharmacological management, as well as case management to help with access to community resources. (Tr. 372).

Plaintiff returned to Murtis Taylor in November 2014 for a pharmacological management session. (Tr. 376). She continued her prior complaints "but to a lesser degree than previously. *Id.* Plaintiff's affect was appropriate, mood was euthymic, thought process and content were coherent, and her judgment and insight were fair. *Id.* She was taking Abilify and was "[g]rossly psychiatrically stable but could benefit from increased dose . . . due to some lingering [symptoms]." *Id.*

Plaintiff was again found to be "[s]table psychiatrically" in December 2014, and was "[d]oing well" on the increased dose of Abilify. (Tr. 378). Similarly, in January 2015, she was "[g]rossly psychiatrically stable", but the provider noted she would "need to increase Abilify as no other samples are available." (Tr. 401). She was still stable in February 2015, with Seroquel added for complaints of insomnia. (Tr. 396). She was again stable in March 2015 and continued on her current medications. (Tr. 399). In November 2015, Plaintiff was "somewhat anxious" and stated she had a test that day. (Tr. 454). Her speech was pressured and mood irritable. *Id.* She reported her medications were working, helping with mood swings and insomnia, and noted she was doing well in school. (Tr. 455). Her psychiatric exam was normal at appointments for non-mental health reasons later in 2015. (Tr. 443, 449).

At a medication management appointment at Murtis Taylor in February 2016, Plaintiff was "[a]lert, talkative, [and] engaging". (Tr. 458). She continued her culinary classes and was on track to graduate in December. *Id.* Plaintiff reported she continued to hear voices, and she broke

windows out of anger due to a breakup. *Id.* She also had "[s]ome depression." *Id.* Later that month, Plaintiff denied any stressors, and stated she was "doing well" with medications. (Tr. 461). She was described as "[s]till with some residual symptoms but is focused on life events and is goal oriented." (Tr. 462). She was continued on her medication regimen. *Id.*

*Investigation*

In May 2013, the Social Security Administration's Cooperative Disability Unit undertook an investigation of Plaintiff to determine if Plaintiff was involved in fraud in obtaining disability benefits on a prior application. (Tr. 302-114).[1] The investigators reported they made contact with Plaintiff while she was walking toward her home, talking on her cell phone. (Tr. 307). They noted Plaintiff "carried on a normal conversation and never needed anything simplified" and "had a good memory and recall of events from the past." *Id.* Plaintiff told the investigators she was a full-time student, attending community college studying culinary arts. *Id.* Plaintiff also told them she had taken a bus by herself from Cleveland to Columbus five months prior, staying at a hotel, to take a state board of cosmetology test. (Tr. 308). However, she overslept and missed the test. *Id.* She also reported using public transportation, and had a bus pass through the college. *Id.* The investigators also noted internet research revealed Plaintiff had a valid driver's license issued in February 2011 and expiring in March 2014. She had two traffic tickets (a speeding offense in August 2011, and a driving under suspension from June 2010) issued after her prior alleged onset date of May 1, 2006. *Id.*

---

1. The "Nature of Referral" section of the investigative report states the reason for the investigation is "because of an allegation of fraud that was referred from within the Ohio Disability Determination Service (DDS)" and "DDS discovered areas of conflict in the medical evidence of record in comparison to [Plaintiff's] statements regarding her alleged limitations". (Tr. 304).

*Opinion Evidence*

*Treating Providers*

In March 2016, Beckie Kenney, P.C.C., assessed Plaintiff's mental functional capacity. (Tr. 487-88). M.E. Gordillo, M.D., co-signed the opinion one week later in April 2016. *See* Tr. 488. The opinion indicated Plaintiff could occasionally follow work rules, respond appropriately to changes in routine settings, deal with the public or interact with supervisors, deal with work stress, or function independently without redirection. (Tr. 487). She could rarely use judgment, maintain attention and concentration for two hour segments, relate to co-workers, work in proximity to others without being distracted or distracting, or complete a normal workday and workweek without interruption from symptoms. *Id.* She could frequently maintain regular attendance and be punctual. *Id.* The opinion also indicated Plaintiff could rarely understand, remember, and carry out complex or detailed job instructions. (Tr. 488). However, Plaintiff could frequently handle simple job instructions. *Id.* Regarding Plaintiff's social abilities, they opined Plaintiff could occasionally maintain her appearance, behave in an emotionally stable manner, relate in social situations, and leave home on her own. *Id.* However, she could rarely socialize. *Id.* As the diagnosis to support these findings, they cited Plaintiff's schizoaffective disorder with symptoms of depression, anxiety, auditory hallucinations, mood swings, and paranoia. *Id.* They also noted Plaintiff had been "under the care of [their] practice or facility" since October 2014. *Id.*

*Consultative Examiners*

In 2007, Plaintiff underwent a consultative psychological examination with Sally Felker, Ph.D. (Tr. 264-67).[2] Plaintiff reported she attended a special school for behavioral disorders, was in special education classes, and repeated first grade. (Tr. 264). She reported she did not have a

---

2. This examination was performed as part of a prior disability application.

5

GED. *Id.* Plaintiff worked at fast food restaurants and for temporary agencies, but "said that she has never been employed for very long." *Id.* Plaintiff reported mental problems, asthma, and a hearing impairment. (Tr. 265). Plaintiff stated she was depressed, anxious, and irritable at times; she had trouble sleeping. *Id.* Dr. Felker stated Plaintiff "gives the impression that she cannot manage her affairs" and was living with a friend "who helps her considerably." (Tr. 266). Plaintiff reported her friend had a chart, and rewarded her for positive behavior. *Id.* "She gave the impression that it is a supervised situation." *Id.* Dr. Felker assessed a full scale IQ of 63, a verbal IQ of 67, and a performance IQ of 63. (Tr. 267). Her full scale IQ score placed her "at the mildly retarded range of adult intellectual functioning", which Dr. Felker opined seemed to be "a fairly accurate indication of her current level of functioning." *Id.* Dr. Felker diagnosed schizoaffective disorder, mixed substance abuse (in recent remission), and mild mental retardation. *Id.* She opined Plaintiff was moderately impaired in her: 1) ability to concentrate and attend to tasks; 2) ability to relate to others and deal with the general public; and 3) ability to understand and follow instructions, and to carry out routine tasks. *Id.* Her ability to relate to coworkers, supervisors, and to tolerate employment stress appeared to be markedly impaired. *Id.*

In January 2013, Plaintiff underwent another consultative psychological examination with David House, Ph.D. (Tr. 296-300). Plaintiff reported having friends, going to church "sometimes", and volunteering with church. (Tr. 297). Plaintiff stated she earned a GED while in prison. *Id.* Plaintiff reported some difficulty with grades, but denied having been in special education. *Id.* She also told Dr. House she was enrolled in community college. *Id.*[3] On examination, Dr. House noted Plaintiff's speech was tangential and pressured, with loose associations. (Tr. 298). Her thinking

---

3. Dr. House later noted he "would wonder how she could function in that environment given her current presentation." (Tr. 300).

"appear[ed] fragmented", which Dr. House observed "may be related to some psychotic process." (Tr. 299). Dr. House also noted "[k]eeping her on task and on target is difficult." (Tr. 298). Dr. House opined Plaintiff suffered from schizoaffective disorder. (Tr. 300-01). In his functional assessment, Dr. House opined Plaintiff was markedly impaired in both memory function and concentration. (Tr. 300). He noted she was socially isolated did not otherwise interact with anyone aside from the individual who cared for her. *Id.* Finally, he noted her "level of emotional resources and coping skills appear extremely low and she would have a great deal of difficulty being functional in a work environment. *Id.*

In May 2014, Plaintiff underwent a second consultative psychological examination. (Tr. 349-52). J. Joseph Konieczney, Ph.D. noted Plaintiff was a "vague historian". (Tr. 349). When asked about her disability, Plaintiff stated, "I'm hearing impaired." *Id.* Dr. Konieczney observed Plaintiff was "quite blunted in her presentation" and was tearful during her evaluation. (Tr. 350). He did not observe any indications of nervousness or anxiety. *Id.* Plaintiff reported a history of depression, mood swings, and auditory hallucinations. *Id.* Although Dr. Konieczney noted "[s]ome paranoid thinking", he also noted she showed no indications she was responding to internal stimuli during the evaluation. *Id.* Plaintiff reported receiving her GED in jail in the 1990s, and that she was currently attending a full-time community college culinary program. *Id.* On examination, Dr. Konieczney observed Plaintiff's "level of motivation and participation . . . seemed adequate." (Tr. 351). She "spoke reasonably well with no looseness of associations or tangentiality evident in her conversation", but "did show some poverty of content in her speech." *Id.* He observed Plaintiff had hearing difficulties, and he had to ask her questions loudly. *Id.* However, "she seemed quite capable of expressing herself in a coherent manner." *Id.* Plaintiff maintained eye contact throughout the evaluation. *Id.* Dr. Konieczney observed Plaintiff's ability to concentrate "showed

7

indications of moderate to marked impairment." *Id.* Plaintiff reported daily activities of exercise, getting dressed, eating breakfast (prepared by a friend), and going to school (driven by a friend). *Id.* Dr. Konieczney opined Plaintiff suffered from schizoaffective disorder, depressive type, post-traumatic stress disorder, and borderline intellectual functioning. (Tr. 351-52). He noted her February 2007 full scale IQ score of 63 would place her in the category of "mild intellectual disability", but given ability to obtain a driver's license, "it is likely that her true level of intellectual functioning extends beyond that", and a diagnosis of borderline intellectual functioning "would seem more appropriate". (Tr. 352). Ultimately, Dr. Konieczney opined Plaintiff would have moderate limitation in understanding, remembering, and carrying out instructions. *Id.* She would "have difficulty in maintaining focus and persistence on mild to moderately complex multi-step tasks." *Id.* She would also have difficulty responding appropriately to supervision, co-workers, and to pressure in the work setting. *Id.*

*Reviewing Physicians*

In June 2014, state agency psychologist Karla Voyten, Ph.D., reviewed Plaintiff's records. (Tr. 104-06). She noted Plaintiff's psychological impairments as schizophrenia, affective disorders, anxiety disorders, and borderline intellectual functioning. (Tr. 104-05). She opined Plaintiff would have mild restriction in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 105). Dr. Voyten further explained:

> The clmt appears less than fully credible with a great amount of inconsistent information in file from inconsistency to reporting psychotic symptoms, to presenting with mental retardation while attending college, etc. There have been past investigation of this individual indicating that she is fully functional with regard to adl's, social functioning, and cpp. She has no significant history of mental health treatment. We will not give weigh[t] to the examiner's findings but instead give greater consideration to the historical social media findings where in the clmt reports her functioning to be not impaired. Impairment is not severe.

8

(Tr. 105-06).

In February 2015, state agency psychologist Paul Tangeman, Ph.D., reviewed Plaintiff's records. (Tr. 92). He reached the same conclusions as Dr. Voyten. *Id.*

<u>Testimony and Function Reports</u>

In April 2014, Plaintiff completed a Function Report for the Social Security Administration. (Tr. 217-24). In it, Plaintiff reported daily activities of: "wash[ing] up, eat[ing] breakfast[,] then off to the bus stop to catch the bus to go to Tri-C college to learn. Come home[,] eat dinner, do homework, take medicine + watch t.v. + go to sleep." (Tr. 218). She stated she needed special reminders to do some personal care tasks (getting dressed, washing, combing hair). (Tr. 219). She also reported performing tasks such as ironing, sweeping, and taking out the trash, but needing reminders. *Id.* She also took the bus on a daily basis, and shopped in stores (for food clothes, movies, and personal care items) once per month. (Tr. 220). She reported being able to pay bills and count change, but did not know how to use money orders or a savings account. *Id.* For hobbies and interests, she noted washing television, playing video games, reading, eating, walking, and shopping. (Tr. 221). She reported spending social time with others on a daily basis (including tutoring, to the library, the store, church, and the "game exchange"). *Id.*

At the April 2016 hearing, Plaintiff testified she had an eleventh grade education (in special education), and a GED. (Tr. 61). She lived alone (Tr. 49), but used to live with a boyfriend who helped with daily activities such as shopping, grooming, and getting her to school (Tr. 51). Plaintiff had a driver's license, which she obtained after four attempts at the test. (Tr. 61). She did not drive, but took public transportation. (Tr. 52-53).

Plaintiff cooked simple meals, ordered groceries for delivery, played video games, and used a computer for social media and the internet. (Tr. 56-57). She performed some chores around

the house. (Tr. 59) ("I do what I can sometimes"). She took her medications from a pill box that a friend helped her fill weekly. (Tr. 55). Plaintiff testified her medication helped prevent auditory hallucinations. (Tr. 55). She talked with family out of state on the phone about once every two or three months. (Tr. 60).

Plaintiff testified she was disabled due to problems with her hands, hearing difficulty in her right ear, and her lack of attention span. (Tr. 54). Plaintiff also testified that coworkers made fun of her in prior jobs. (Tr. 64). Plaintiff testified to difficulties with depression, crying spells, mood swings, and controlling her anger. (Tr. 63-65). Her symptoms sometimes interfered with sleep. (Tr. 65).

Plaintiff stated she started a community college culinary program in 2013, which ended in December 2015. (Tr. 51). She did not graduate because she failed her classes. *Id.* She also had a tutor and mentor when attending the program. (Tr. 51, 61-62). During her time as a student, she had trouble following directions, so they "let [her] make simple stuff" such as buttering pans and checking on cooking times. (Tr. 57).

<u>Vocational Expert</u>

A vocational expert appeared and testified at the hearing. (Tr. 70-77). She testified that an individual of Plaintiff's age, education, work experience, with the RFC as defined by the ALJ could perform a significant number of jobs in the national economy. (Tr. 72-73). She also testified that an individual who was off-task for twenty percent of a workweek would not be capable of full –time competitive employment. (Tr. 73-74). Similarly, she testified that an individual limited to unskilled employment who needed redirection occasionally (one-third of the day) would not be able to sustain competitive employment. (Tr. 74-75).

ALJ Decision

In his May 16, 2016 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through June 30, 2018, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 25). He concluded Plaintiff had severe impairments of hearing loss, obesity, schizophrenia, depression, anxiety, and borderline intellectual functioning, but these impairments—individually or in combination—did not meet or equal the severity of a listed impairment. (Tr. 25-26). In this analysis, the ALJ expressly considered Listing 12.05. (Tr. 26-28). The ALJ then concluded Plaintiff retained the residual functional capacity:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can never climb ladders, ropes and scaffolds; she is limited to hearing and understanding simple oral instructions and communicating simple information. She can have no exposure to unprotected heights, moving mechanical parts or any operation of a motor vehicle but can have frequent exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme heat, extreme cold and must work in a quiet environment. She is limited to performing simple, routine and repetitive tasks but not at a production rate pace (i.e. assembly line work) and is limited to simple work related decisions in using her judgment and dealing with changes in the work setting. The claimant can frequently interact with supervisors, co-workers, and the public.

(Tr. 28). Given this Plaintiff's age, education, and this RFC, the ALJ concluded there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 35). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 36).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

11

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff contends the ALJ erred in three ways: 1) in failing to find Plaintiff met the requirements of Listing 12.05(C); 2) in failing to give proper weight to the opinion of Plaintiff's treating psychiatrist; and 3) in improperly evaluating and misstating the opinions of the consultative examiners. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned recommends the Court affirm the Commissioner's decision.

Listing 12.05(C)

Plaintiff contends the ALJ should have found that her IQ score, combined with her additional mental disorders met or equaled the requirements of Listing 12.05(C). The Commissioner contends the ALJ properly determined Plaintiff did not meet the listing's requirements.

The listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard, preventing them from performing *any* gainful activity—not just substantial gainful activity—regardless of age,

education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); SSR 83-19, at 90). The listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes specific medical criteria, which a claimant must prove her impairment satisfies to qualify for benefits under a listing. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530. It is Plaintiff's burden to establish she meets or equals a Listing. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> Listing 12.05, which defines intellectual disability, provided:
>
> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05.[4] Plaintiff's argument involves the requirements in Paragraph C:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05(C). In other words, a claimant must make three showings to satisfy Listing 12.05(C): "(1) she experiences 'significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period' (i.e., the diagnostic description); (2) she has a 'valid verbal, performance, or full scale IQ of 60 through 70'; and (3) she suffers from 'a physical or other mental impairment

---

4. The Social Security Administration issued new regulations in September 2016, which took effect in January 2017, for the mental listings. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The ALJ issued his decision in May 2016, and thus properly based his findings on the prior version of Listing 12.05.

imposing an additional and significant work-related limitation of function.' " *West v. Comm'r Soc. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); citing *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001)).

The ALJ in this case explained his finding that Plaintiff did not meet Listing 12.05(C):

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The claimant underwent IQ testing in 2007 and was found to have a full-scale IQ score of 63 (1F). While the examiner conducting that testing believed the score valid, Joseph Konieczney, Ph.D., opined in 2014 that that score was not valid, citing that the claimant had secured a driver's license (10F). While the undersigned concurs to some extent with the claimant's representative that this one factor alone appears to be thin reasoning for dismissing the score, his conclusion is buttressed by other evidence from other sources as outlined in more detail below. This supporting evidence includes the results of an investigation, the claimant's ability to persist for at least 2 years in a community college program and an overall ability to manage her activities of daily living and personal affairs particularly the claimant's own statements in her Function Report (4E). The undersigned is not prepared to merely disregard Dr. Konieczney's opinion regarding the score's invalidity without due consideration for this ancillary evidence that support his conclusion, no matter how the opinion was presented in his narrative report.
>
> In the alternative, the undersigned also notes that the evidence above erodes evidence that the claimant's other impairments impose an additional and significant work-related limitation of function as she is able to manage her daily activities and maintain adherence in a college level program.

(Tr. 28). Further, later in his opinion, the ALJ explained he assigned Dr. Felker's opinion (including the IQ score) "little weight" because: 1) "another consultative examiner believed this score was invalid"; 2) it was based on "many of the claimant's assertions at face value" and "on the claimant's subjective description of her complaints, which as noted above, are unreliable"; and 3) it was "internally inconsistent". (Tr. 33).

The parties dispute, in essence, whether the ALJ's finding that Dr. Felker's IQ score was invalid is proper and supported by substantial evidence. Plaintiff contends the ALJ improperly

15

substituted his own opinion for a physician's in supplying reasons for its invalidity. However, the Sixth Circuit and courts therein have found discussions of a Plaintiff's daily activities to be an acceptable reason for an ALJ to invalidate a low IQ score. For example, in *Courter v. Commissioner of Social Security*, the Sixth Circuit cited a claimant's daily functional abilities as supportive of an ALJ's decision to discount a psychologist's assignment of an IQ score of 59:

> T]he following evidence was before the ALJ and supported his finding that Claimant did not qualify as mentally retarded under Section 12.05: Claimant was able to care for herself and her father's apartment, including cooking, cleaning, shopping, keeping track of her medical appointments, and maintaining personal hygiene. She had extensive prior work history as a cleaner and prep cook for several different companies[.]

*Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012); *see also Lowes v. Comm'r of Soc. Sec.*, 2013 WL 4413751, at *6-7 (E.D. Mich. 2013) (finding claimant's hobbies and work history were evidence supporting ALJ's decision not to declare claimant disabled despite a measured IQ score in the necessary range); *accord Muncy v. Apfel*, 247 F.3d 728, 733 (8th Cir. 2001) ("An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior."); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) ("It was therefore proper for the ALJ to examine the record in assessing the reliability of Clark's [IQ] scores."). As the Sixth Circuit explained in *Courter*, "the mere fact of a qualifying IQ score does not require that the ALJ find mental retardation . . . when substantial evidence supports the contrary conclusion or the claimant's allegations of her capabilities are deemed not credible." *Courter*, 479 F. App'x at 721.

The ALJ provided substantial evidence to support his conclusion that Dr. Felker's IQ score was invalid (despite Dr. Felker's opinion that it was valid). The ALJ cited Dr. Konieczney's questioning of the score based on Plaintiff's ability to obtain a driver's license. (Tr. 28) (citing Tr.

352). The ALJ also recognized and cited other substantial evidence in the record to support this conclusion. Notably, although Dr. Konieczney only cited Plaintiff's obtaining of a driver's license to support his questioning of the IQ score, the ALJ followed the same line of reasoning—citing evidence demonstrating Plaintiff's overall level of functioning was higher than suggested by the IQ score. The ALJ cited the 2013 investigation (Tr. 28)—which noted Plaintiff was a full-time student, able to carry on a normal conversation, and had recently traveled alone by bus from Cleveland to Columbus, staying in a hotel overnight. *See* Tr. 307-08. Plaintiff also reported using public transportation, and seeking out help with paying her utilities. (Tr. 308). Further, the ALJ noted Plaintiff's "overall ability to manage her activities of daily living and personal affairs particularly the claimant's own statements in her Function Report (4E)." (Tr. 28). In that Function Report, Plaintiff reported daily activities of: "wash[ing] up, eat[ing] breakfast[,] then off to the bus stop to catch the bus to go to Tri-C college to learn. Come home[,] eat dinner, do homework, take medicine + watch t.v. + go to sleep." (Tr. 218). She also reported performing tasks such as ironing, sweeping, and taking out the trash, but needing reminders. (Tr. 219). She also took the bus on a daily basis, and shopped in stores once per month. (Tr. 220). As noted above, consideration of a plaintiff's activities and abilities is a valid reason to discount an IQ score. *See Courter*, 479 F. App'x at 721.

The general principle regarding review of ALJ decisions also comes into play here. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The undersigned finds the ALJ here provided substantial evidence in support of his decision to find the IQ score invalid. Without a valid IQ score, Plaintiff cannot meet the requirements of Listing 12.05(C). As such, this Court should affirm.

17

Opinion Evidence

Plaintiff next contends the ALJ erred in his evaluation of medical opinion evidence. Specifically, she argues the ALJ erred in his analysis of an opinion from her treating psychiatrist, Dr. Gordillo. And second, she contends the ALJ misrepresented and improperly evaluated the opinions of Drs. House and Konieczney, the consultative examiners. The Commissioner responds that the ALJ did not err in his evaluations.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: 1) examining relationship; 2) treatment relationship—length, frequency, nature and extent; 3) supportability; 4) consistency; and 5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

*Treating Physician*

Plaintiff contends the ALJ erred in evaluating the joint opinion from Ms. Kenney and Dr. Gordillo because: 1) he did not recognize that Dr. Gordillo co-signed the opinion, and 2) his reasoning for assigning the opinion little weight were conclusory, and 3) the record, and regulatory factors, support giving the opinion greater weight. The Commissioner responds that the ALJ properly considered the opinion and provided the required "good reasons" for the weight assigned. The undersigned agrees with the Commissioner that regardless of the ALJ's failure to identify Dr. Gordillo's co-signature, the ALJ provided the required good reasons, and therefore recommends the Court affirm the ALJ's decision in this regard.

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals

most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004)).

In addition, even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Rogers,* 486 F.3d at 242. Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409–10 (6th Cir.2009).

The ALJ addressed the opinion at issue here:

> Ms. Beckie Kenney, one of the claimant's treating counselors at Murtis Taylor, also provided a medical source statement as well (22F). She opined that the claimant would only be able to occasionally to rarely perform in a range of subareas related to occupational adjustment, intellectual functioning and in marking personal and social adjustments. These opinion statements were given little weight, as these conclusions are unsupported by the claimant's progress notes and her demonstrated abilities, showing that the claimant improved with medication and therapy.

(Tr. 34). Plaintiff is correct that the opinion at issue was signed by Ms. Kenney, and co-signed by Dr. Gordillo. *See* Tr. 488. Even assuming this is properly addressed as a treating physician opinion,

the ALJ provided the required good reasons, supported by substantial evidence of record, for the weight assigned.[5]

Plaintiff faults the ALJ for not citing the specific records in support of his statement that Ms. Kenney/Dr. Gordillo's opinion was "unsupported by the claimant's progress notes and her demonstrated abilities, showing that the claimant improved with medication and therapy." (Tr. 34). But the ALJ did discuss these records, in detail, just a few pages earlier in his decision. *See* Tr. 31-32 (two paragraphs describing treatment at Murtis Taylor in 2014 and 2015). *See also Crum v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this records. But it suffices that she listed them elsewhere in her opinion."). And the cited records support the ALJ's statement that the record did not support the more restrictive limitations opined by Ms. Kenney/Dr. Gordillo.

The treatment notes from Murtis Taylor show at her initial presentation in October 2014, Plaintiff was off her medication and was struggling with outbursts, depression, and crying spells. (Tr. 364). She also had racing thoughts and auditory hallucinations, and was angry and agitated. (Tr. 370). However, Plaintiff also reported medications had worked well for her in the past. (Tr.

---

5. In their briefs, both parties address Dr. Gordillo as a treating psychiatrist. The undersigned, however, notes, that Dr. Gordillo's name does not appear in the submitted treatment records from Murtis Taylor. *See* Tr. 364-401; 451-64. Thus, it is unclear to the undersigned that Dr. Gordillo even qualifies as a treating physician entitled to deference. *See Daniels v. Comm'r of Soc. Sec.,* 152 F. App'x 485, 490-91 (6th Cir. 2005) (noting that, even though the ALJ casually referred to a doctor as a treating source, the ALJ's failure to specifically address that doctor's opinion was not surprising because the doctor did not meet the requirements under the regulations to be defined as a treating physician); *see also Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007) (finding that doctors who had examined the claimant on a single occasion or treated claimant on a very limited basis did not constitute the type of ongoing treatment relationship contemplated by the "treating physician rule"). Regardless, as discussed below, even if Dr. Gordillo's opinion were entitled to deference, the ALJ provided the required good reasons to support the weight assigned.

371). By the following month, she was noted to have the same complaints, "but to a lesser degree than previously", and was assessed as "[g]rossly psychologically stable, but could benefit from increased dose of Abilify due to some lingering [symptoms]." (Tr. 376). At each visit thereafter (in December 2014, as well as January through March 2015), Plaintiff was again noted to be psychiatrically stable. (Tr. 378, 401, 396, 399). At her December 2014 visit, she "[d]enie[d] psychiatric issues", and her mental status examination was essentially unremarkable. (Tr. 378). In February 2015, her "[o]nly complaint" was insomnia. (Tr. 396). Further, February 2016, she was "[a]lert, talkative, [and] engaging", despite some continuing auditory hallucinations (Tr. 458). Later the same month, she stated she was "doing well" with her medications despite some residual symptoms. (Tr. 461-62). Thus, the ALJ did not err in finding this opinion "unsupported by the claimant's progress notes . . . showing that the claimant improved with medication and therapy." (Tr. 34). *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records as second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in his opinion."); *see also Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (ALJ "reasonably discounted" an opinion where the "proposed limitations were inconsistent with his own treatment notes from the relevant period" and "also conflicted with [the plaintiff's] daily activities and the majority of other medical evidence in the record"); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (improvement on medication a valid factor in discounting allegations of disabling symptoms).

As a second reason for discounting this opinion, the ALJ noted it was "unsupported by . . . [Plaintiff's] demonstrated abilities." (Tr. 34). Although the ALJ did not cite anything specifically, throughout the rest of his opinion, the ALJ cited evidence to show Plaintiff was less limited than

she alleged. *See* Tr. 29. This included Plaintiff's own testimony that she cooked simple meals, ordered groceries for delivery, played video games, and used a computer. (Tr. 29); *see also* Tr. 56-57. She also testified her medications helped somewhat, and prevented auditory hallucinations. (Tr. 55). Further, the ALJ cited the 2013 Cooperative Disability Unit investigation as evidence Plaintiff was less limited than she alleged. *See* Tr. 32-33. During that investigation, as the ALJ observed, investigators noted Plaintiff could communicate, never required simplification, recited both her social security number and two phone numbers from memory "without hesitation", and had recently traveled alone to Columbus. (Tr. 32) (citing Tr. 302-11). Moreover, the ALJ noted Plaintiff's time spent as a student in community college "tends to undermine her allegations of significant [borderline intellectual functioning] and problems with basic comprehension and daily functioning."(Tr. 30). Again, Plaintiff's broader activities provided a good reason for the ALJ to discount Ms. Kenney and Dr. Gordillo's opinion. *Lester*, 596 F. App'x at 389 (affirming where a treating physician's "proposed limitations also conflicted with [the plaintiff's] daily activities and the majority of other medical evidence in the record").

The undersigned finds the ALJ provided the required "good reasons" for discounting Ms. Kenney and Dr. Gordillo's opinion that Plaintiff was more limited than found by the ALJ. That is, these records contradict the opinion that Plaintiff could only rarely perform many occupational adjustments (such as using judgment, or maintain attention for two hour segments), or intellectual functioning (such as only occasionally remember and carry out simple job instructions) or making personal and social adjustments (such as only occasionally leaving home on her own). *See* Tr. 487-88. The ALJ addressed the consistency of the opinion with the record as a whole, and the supportability of the opinion by the Murtis Taylor treatment records. *See Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x 472, 473 (6th Cir. 2013) (affirming decision where ALJ gave little weight to

treating physician opinion because: 1) it was based primarily on subjective complaints, and 2) it was contradicted by other substantial evidence in the record); *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding that express consideration of supportability and consistency is sufficient); *Benneman v. Comm'r of Soc. Sec.*, 2012 WL 5384974, at *1 (N.D. Ohio) (same). Thus, the undersigned finds he provided the required good reasons for discounting this opinion, and his decision to do so is supported by substantial evidence as discussed above. For this reason, the undersigned recommends the Commissioner's decision in this regard be affirmed.[6]

*Consultative Examiners*

Plaintiff next contends the ALJ erred in his treatment of consultative examiners Drs. House and Konieczney. The Commissioner responds that the ALJ did not err, and his decision is supported by substantial evidence in the record. The undersigned agrees with the Commissioner and recommends the ALJ's decision be affirmed.

Opinions of consultative examiners are not subject to the same "good reasons" requirements as treating physicians, but an ALJ must still consider the factors set out in 20 C.F.R. §§ 404.1527(c), 416.927(c). *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013).

*Dr. House*

Plaintiff argues the ALJ erred in discounting Dr. House's opinion on the basis of Plaintiff's community college attendance when Dr. House was aware of that attendance and still imposed the opined limitations.

---

6. Because the ALJ need only include in the RFC those limitations he finds credible, *see Casey v. Comm'r of Soc. Sec.,* 987 F.2d 1230, 1235 (6th Cir. 1993), and the ALJ provided the required good reasons for discounting this opinion, the undersigned need not reach Plaintiff's argument that had the opinion been credited, the VE testified no work would be available, *see* Doc. 13, at 14.

The ALJ addressed this opinion in his decision:

> Dr. House opined that the claimant's memory function was markedly impaired along with her concentration and attention. He also opined that she would have a great deal of difficulty being functional in a work environment due to her extremely low level of emotional resources and coping skills (4F/6). These opinions were given little weight as the examiner appeared to rely heavily on the claimant's subjective complaints and even noted that the claimant's ability to go to community college was inconsistent with the level of functioning that she displayed. This, in concert with indications that she was set to graduate from college, (19F/8) tend to show that the claimant may have underrepresented her abilities during this exam and possibly the earlier consultative exam as well.

(Tr. 33).

Plaintiff contends that the ALJ "thus turns Dr. House's opinion on a negative conclusion that the doctor already accounted for." (Doc. 13, at 15). The difference, however, is that Dr. House appears to doubt the veracity of Plaintiff's report of community college attendance, whereas the ALJ notes, based on additional evidence in the record that Plaintiff did in fact attend community college for a significant time period. *See* Tr. 300 (Dr. House's observations: "That she is actually enrolled at Cuyahoga Community College seems a bit of a stretch in the examiner's opinion" and "She said she was going to Cuyahoga Community College but the examiner would wonder how she could function in that environment given her current presentation."); Tr. 33 (citing Tr. 458 (April 2016 note that Plaintiff "[c]ontinues to attend culinary classes")). That is, Dr. House believed someone as limited as he perceived Plaintiff would not be capable of community college attendance. But the ALJ found evidence she indeed had attended, and thus, was less limited than Dr. House believed her to be. The undersigned finds this cited contradiction in the record sufficient reason to support the ALJ's assignment of "little weight" to Dr. House's opinion.

### Dr. Konieczney

Plaintiff next contends the ALJ erred in his evaluation of Dr. Konieczney's opinion because he misstated the doctor's opinion about concentration, persistence, and pace.

24

The ALJ also addressed this opinion in his decision:

> Dr. Konieczney opined that the claimant would have moderate limitations in her ability to understand, remember, carry out instructions and also in attention and concentration. He also noted she would have a significantly diminished tolerance for frustration and diminished coping skills in dealing with pressure in the work setting (10F/5). The undersigned gives these opinions some weight, as they are consistent with the objective evidence showing largely moderate deficits in social functioning and in concentration, persistence and pace along with the other persuasive opinion evidence.

(Tr. 33).

Plaintiff contends the ALJ failed to recognize Dr. Konieczney opined Plaintiff had a *moderate to marked* impairment in maintaining concentration, persistence and pace, not simply *moderate* impairment as the ALJ's decision states. *See* Tr. 351 ("Her ability to concentrate and to attend to tasks showed indications of moderate to marked impairment."). However, despite this alleged misstatement, the undersigned concludes the ALJ did not err. First, the ALJ stated he was giving Dr. Konieczney's opinion "some weight" to the extent it was "consistent with the objective evidence showing largely moderate deficits in social functioning and concentration, persistence and pace along with other persuasive opinion evidence." (Tr. 33). That is, even if Dr. Konieczney opined such limitations were moderate to marked, the ALJ only gave it weight to the extent it supported a moderate limitation. Second, later in his opinion, under the header "Attention and Concentration and Persistence in Single and Multi-Step Tasks", Dr. Konieczney noted: "As a result of her intellectual limitations and mood symptoms, Nicole would have difficulty in maintaining focus and persistence on mild to moderately complex multi-step tasks." (Tr. 352). The ALJ here limited Plaintiff to "simple, routine and repetitive tasks but not at production rate pace" and "simple work related decisions" (Tr. 28). These restrictions are arguably not inconsistent. Finally, as discussed above, the ALJ provided substantial evidence throughout the remainder of his

opinion—in the form of discussion of Plaintiff's daily activities, the disability investigation, and the opinion evidence of record—to support the conclusion that Plaintiff was not markedly limited in attention and concentration. *See* Tr. 29-34.

Thus, the undersigned finds no error in the ALJ's consideration of the medical opinion evidence in this case and recommends the Court affirm his decision. Even though Plaintiff may be able to point to evidence supporting a contrary conclusion, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).